IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Edgar Searcy, ) | |
|                        Plaintiff, ) | Civil Action No. 6:07-0154-GRA-WMC |
| ) | |
|       vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| B. Broome, Chaplain; M. Hamidullah, ) | |
| Former Warden; U.S. Attorney ) | |
| General; Bureau of Prisons; and ) | |
| United States of America, ) | |
| ) | |
|             Defendants. ) | |
| ) | |

The plaintiff, a federal prisoner proceeding *pro se*, seeks relief pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

On May 14, 2007, the defendants moved for summary judgment. By order filed May 15, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. On June 4, 2007, the plaintiff filed his opposition to the motion for summary judgment.

## FACTS PRESENTED

The plaintiff was sentenced on December 4, 2003, to a 180-month term of imprisonment by the United States District Court for the Southern District of Florida, for Use

of Interstate Commerce to Engage in a Sexual Activity with a Minor (18 U.S.C. § 2422(b)) (def. m.s.j., ex. 1, Sentence Monitoring Computation Data).  He is currently incarcerated at the Federal Correctional Institution ("FCI") Estill, South Carolina, and has a projected release date of May 9, 2016, via Good Conduct Time ("GCT") release.  The defendants in this action are J. Brian Broome, Supervisory Chaplain, FCI Edgefield; Matthew Hamidullah, Former Warden, FCI Edgefield; Alberto Gonzalez, United States Attorney General; the Federal Bureau of Prisons; and the United States of America.

The plaintiff  alleges the defendants have violated his First and Fifth Amendment rights by denying him the right to associate and practice the Mennonite faith. Specifically, he claims members of the Mennonite faith are obligated under biblical doctrine to associate with other Mennonite members for the purpose of supporting the family and church community.  He asserts the defendants have violated his rights to association and due process because they do not provide a separate worship service for Mennonites and because they do not permit inmates confined in the institution Special Housing Unit ("SHU") to attend congregate worship services.  He also claims the defendants are mandated under 18 U.S.C. §§ 3621(b) and 3624(c) to place him in a Residential Reentry Center ("RRC") (halfway house) for the remainder of his sentence so he may adhere to the unique obligation of association with other Mennonites.  As relief, the plaintiff asks the court to order the BOP to consider housing him in an RRC to accommodate his right to associate for the purpose of practicing his religious doctrines as a Mennonite; to allow him the opportunity to attend general population worship services when he is placed in the SHU; and to mandate the institution provide separate worship services for those of the Mennonite faith.

The FCI Estill Religious Services Department has two chaplains to provide religious services to approximately 1300 inmates (def. m.s.j., ex. 5, J. Brian Broome decl. ¶ 4). There are several religious faith groups at FCI Estill for which the Religious Services

2

Department provides equal worship and study time (def. m.s.j., ex. 6, Religious Services Program Schedule). The plaintiff is the only inmate at FCI Estill who professes to practice the Mennonite faith (Broome decl. ¶ 4). Inmates who practice the Mennonite faith, as well as other Christian denominations (Baptist, Methodist, Presbyterian, Holiness, Church of Christ, Pentecostal, Lutheran etc.), are given the religious preference assignment of Protestant/General Christian (Broome decl. ¶ 4). It is common practice throughout the BOP to have one general worship service for those in the Protestant/General Christian assignment because, although each individual denomination with this assignment has their own significant religious practices, they all basically share the same common religious tenets (Broome decl. ¶ 7). According to the defendants, to provide separate worship services for each of the denominations in this assignment would place a tremendous burden on the already limited resources of the FCI Estill Religious Services Department (Broome decl. ¶ 7).

There are approximately 709 inmates at FCI Estill whose religious preferences fall within the Protestant/General Christian assignment (Broome decl. ¶ 6). Because of space, time, and staff resource limitations, one general worship service is conducted for the various denominations in the Protestant/General Christian assignment (Broome decl. ¶ 6); (def. m.s.j., ex. 7, Matthew Hamidullah decl. ¶ 4). During the Protestant/General Christian worship service at FCI Estill, musical instruments are played, hands are clapped, and inmates vocalize praises, which are common practices based in the culture and tradition of religious services prevalent in FCI Estill's geographical locale (Broome decl. ¶ 9); (Hamidullah decl. ¶ 5). In order to accommodate inmates who object to the playing of musical instruments, including the plaintiff, the FCI Estill chaplaincy has agreed to periodically conduct instrument-free worship services (Broome decl. ¶ 9). However, according to the defendants, given the percentage of inmates in the Protestant/General Christian assignment whose religious culture accept the practice of playing musical

3

instruments, compared with those who do not, providing a separate instrument-free service prohibiting hand clapping and vocalized praises would not be considered an effective use of limited resources (Broome decl. ¶ 9); (Hamidullah decl. ¶ 5).

FCI Estill provides separate worship services for inmates of other faiths (Muslim, Catholic, Native American, Hindu, Nation of Islam, Judaism, etc.); however, these are provided not because of the individual practices of these faiths but because of the vast theological differences of these faiths (Broome decl. ¶ 8); (def. m.s.j., ex. 6).  The number of inmates at FCI Estill who practice these faiths are fewer in number than those who practice general Christianity (Broome decl. ¶ 8).

The plaintiff was placed in Administrative Detention status within the confines of the FCI Estill SHU from September 17, 2006, through December 19, 2006 (def. m.s.j., ex. 8, Elizabeth Carlson decl. ¶ 3); (Broome decl. ¶ 10).  His placement in Administrative Detention was due to his reporting to prison officials that he had been assaulted by another inmate (Carlson decl. ¶ 3).  The plaintiff was placed in Administrative Detention for his protection and to investigate his claim (Carlson decl. ¶ 3).  Upon completion of the investigation and a determination that his safety was not in jeopardy, the plaintiff was released back into the general population (Carlson decl. ¶ 3).

Ordinarily, all inmates have access to regularly scheduled congregate religious services (def. m.s.j., ex. 4, p. 7).  However, inmates confined in Administrative Detention are not permitted to attend congregate services because the reasons an inmate can be placed in Administrative Detention dictate that it could jeopardize the safe and secure operation of the institution to have them in such a setting (Broome decl. ¶ 11).  Even though BOP policy does not permit inmates confined in Administrative Detention to attend congregate worship services, inmates in this status have regular access to chaplains for pastoral care and are provided opportunities to receive sacraments and sacred rituals (def. m.s.j., ex. 4, p. 7); (Broome decl. ¶ 12).  Also, upon written request, they may have access

4

to recognized representatives of their faith groups. *Id.* According to the defendants, while he was housed in Administrative Detention, the plaintiff was provided with several means to practice his religion such as visits from the FCI Estill chaplaincy and telephone calls to Mennonite Clergy (Broome decl. ¶ 13). He was permitted to retain items such as a Bible and other religious reading materials. *Id.*

According to the defendants, the religious needs of an inmate are not a determinative factor in RRC placement, and the chaplaincy staff at FCI Estill is not involved in determining who is or is not eligible for RRC placement (Broome decl. ¶ 14). This determination is at the sole discretion of the inmate's unit team and Warden. *Id.* The BOP utilizes RRCs to provide a transitional environment for inmates nearing the end of their sentences and has promulgated rules for placing inmates in an RRC (Carlson decl. ¶ 4); (def. m.s.j., ex. 9, Program Statement 7310.04). The placement of an inmate in an RRC is an individualized determination based on assessments of the inmate's need for services, public safety, and the necessity of the BOP to manage its inmate population responsibly. (def. m.s.j., ex. 9, p. 7). The decision to place an inmate into an RRC is generally not established until 11 to 13 months prior to the inmate's projected release date (Carlson decl. ¶ 4); (def. m.s.j., ex. 9, p. 7).

The defendants contend that the plaintiff has not been considered for RRC placement because he does not yet meet the BOP's criteria for such placement (Carlson decl. ¶ 5). They argue that there are several factors, other than the plaintiff's religious needs, that counsel against permitting the plaintiff to serve the remainder of his sentence in an RRC (Carlson decl. ¶ 5). One of the most important factors is the length of sentence imposed on the plaintiff (Carlson decl. ¶ 6). On December 4, 2003, he was sentenced to 180 months imprisonment and has a projected release date of May 9, 2016. The defendants argue that permitting the plaintiff to spend the rest of his incarceration in an RRC would be contrary to the purpose of RRC utilization and would also not best serve the

interests of justice (Carlson decl. ¶ 6). There is no indication from the sentencing judge that the court believed the plaintiff should serve his sentence in an RRC (Carlson decl. ¶ 6). Additionally, the plaintiff has been given a Public Safety Factor of "Sex Offender" (Carlson decl. ¶ 7). A Public Safety Factor is assigned to an individual when relevant factual information regarding an individual's current offense, sentence, criminal history or institutional behavior requires additional security measures be employed to ensure the safety and protection of the public (def. m.s.j., ex.10, Program Statement 5100.08, p. 7). There are six criteria, set forth in Program Statement 5100.08, that warrant assigning an individual with a "Sex Offender" Public Safety Factor (def. m.s.j., ex. 10, p. 8). The plaintiff has been given this assignment because of his current federal conviction of Use of Interstate Commerce to Engage in A Sexual Activity With A Minor, and prior convictions for Sexual Activity with a Child; Lewd, Lascivious or Indecent Assault Upon Child Under Age 16; and Sexual Exploitation of a Child (Carlson decl. ¶ 7). Individuals with a "Sex Offender" Public Safety Factor are ordinarily not referred for RRC placement (def. m.s.j., ex. 9, p. 10).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the

6

disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### First Amendment

The plaintiff brings this case as a First Amendment claim. Even though they are incarcerated, prisoners retain fundamental constitutional rights. *See Turner v. Safley,*

7

482 U.S. 78, 84 (1987).  These rights include the reasonable opportunity to pursue one's religion as guaranteed by the free exercise clause of the First Amendment.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348  (1987).  The First Amendment of the United States Constitution states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Furthermore, the United States Supreme Court has stated that prisoners maintain the right to follow their religion, so long as their religious practices could be reasonably accommodated by prison officials.  However, when those practices conflicted with security concerns, the "legitimate penological objectives" should control.  *O'Lone*, 482 U.S. at 353.  Because of the inherent difficulties and concerns in running a prison, what constitutes a reasonable opportunity to practice one's religion must be evaluated with legitimate penological objectives of the prison.  *Hudson v. Palmer*, 468 U.S. 517, 524 (1984).  Thus, the standard for reviewing the validity of a prison regulation or policy affecting a prisoner's fundamental constitutional right, such as the free exercise of his or her religion, is:  "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.  The *Turner* analysis considers the following factors: (1) whether there is a logical connection between the restriction and the governmental interests invoked to justify it; (2) the availability of alternative means to exercise the restricted right; (3) the impact that accommodation of the right might have on other inmates, on prison personnel, and on allocation of prison resources generally; and (4) whether there are "obvious, easy alternatives" to the policy that could be adopted at *de minimis* cost.  *Id.* at 89-90.

8

This court agrees with the defendants that under the *Turner* analysis the plaintiff cannot prevail on his claim under the First Amendment.  Under the first *Turner* factor, the restriction of the plaintiff's right to associate is logically connected to the government's interests in maintaining order and security in its prisons and protecting society from convicted felons.  Also, the plaintiff is the sole professed Mennonite at FCI Estill and, because of limited institution resources, accommodation of all the religious needs of each and every individual Christian denomination is not possible.

Under the second factor, the plaintiff has been provided means of worship and has not been deprived of all forms of religious exercise.  Even though FCI Estill conducts one general Christian worship service, the FCI Estill chaplaincy has agreed to periodically conduct instrument-free services for those who do not prefer that practice.  The plaintiff has been provided telephonic contact with Mennonite clergy and provided other materials and means to practice the Mennonite faith.

Under the third factor, the plaintiff's requests are untenable and would place a tremendous burden on already limited resources.  Once again, the plaintiff is the sole professed Mennonite at FCI Estill.  The FCI Estill chaplaincy has approximately 1300 inmates for whom to provide religious services.  It is simply not possible, given the limited staff, time, and space at the institution, to provide separate worship services to each and every religious denomination.

Under the fourth factor, obvious, easy alternatives at *de minimis* cost have been offered.  The general Christian worship service does not place an undue burden on the plaintiff's practice of the  Mennonite faith.  Even though it is not possible to conduct a separate worship service solely for the plaintiff, he still has access to other materials and means of practicing his religion (i.e., telephonic contact with Mennonite clergy, Bible, reading material).

**RFRA and RLUIPA**

Given the nature of the plaintiff's claim, it could also possibly be considered under the Religious Freedom Restoration Act of 1993 ("RFRA") and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). In 1993, Congress passed the RFRA, 42 U.S.C. § 2000bb *et seq.*, which seemingly created a new standard of review for free exercise of religion claims. *Brown-El v. Harris*, 26 F.3d 68, 69 (8th Cir. 1994); *Woods v. Evatt*, 876 F.Supp. 756, 761 (D.S.C.1995) *aff'd* 68 F.3d 463 (4th Cir. 1995). The RFRA prohibits "[g]overnment from substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 515-16 (1997). Thus, the RFRA has three components, and a person seeking to state a claim under this section must first show that the government has substantially burdened a person's exercise of religion. *Woods*, 876 F.Supp. at 762. Once the plaintiff makes this showing, the government then has the duty to show that the burden was placed on that person's exercise of religion "in furtherance of a compelling governmental interest" and that there was no less restrictive means to further that governmental interest. *Id.* In 1997, the Supreme Court invalidated RFRA as it applied to states and localities. *City of Boerne*, 521 U.S. 507, 536.

In 2000, Congress enacted the RLUIPA, 42 U.S.C. § 2000cc-1(a)(1)-(2), which provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." In passing RLUIPA, Congress "resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use." *Murphy v. Missouri Dept. Of Corrections*, 372 F.3d 979, 987 (8th Cir. 2004). The proper standard

of review under RLUIPA is: (1) have the defendants imposed a substantial burden on the plaintiff's exercise of religion; (2) does the substantial burden further a compelling governmental interest; and (3) has it been done by the least restrictive means. *See Lovelace v. Lee*, 472 F.3d 176, 182 (4th Cir. 2006).

Neither RFRA or RLUIPA define "substantial burden," but the Supreme Court has defined the term in the related context of the Free Exercise clause. According to the Court, a "substantial burden" has been defined as: "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Board, Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981). However, the burden placed on the religious exercise "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief which is central to religious doctrine." *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987), *aff'd. sub nom.*, *Hernandez v. Commissioner*, 490 U.S. 680 (1989). In *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006), the Fourth Circuit Court of Appeals stated:

> We likewise follow the Supreme Court's guidance in the Free Exercise Clause context and conclude that, for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."

*Id.* at 187 (quoting *Thomas*, 450 U.S. at 718).

The plaintiff cannot prevail on his claims under RFRA/RLUIPA because the defendants have not imposed a substantial burden upon the plaintiff's exercise of religion. The plaintiff asserts that a tenet of the Mennonite faith that requires members to associate for the support of the family and church community trumps any interest the government has in his incarceration. He offers no support in case law, statute, or religious doctrine to

11

support this claim.  The plaintiff's otherwise unfettered right to associate with other members of the Mennonite faith is legitimately restrained by the government's interest in protecting society from convicted felons.  However, even though the plaintiff's right to association with other Mennonite members is restricted due to his incarceration, he is provided with ample opportunity to associate for purposes of expressing his religious beliefs.  He is ordinarily able to congregate and fellowship with all inmates within the general population and write letters and make telephone calls to other Mennonites.  The FCI Estill chaplaincy has also contacted Mennonite congregations on the plaintiff's behalf to establish volunteer visits and provided chaplain-generated telephone calls to Mennonite clergy to assist him with his particular spiritual needs.  The plaintiff still retains his ability to associate as a Mennonite, albeit in a restricted manner.  This is not a substantial burden created by the defendants, but is a fact and circumstance of his incarceration.  *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper incarceration").

        The plaintiff claims FCI Estill should provide a separate worship service for those of the Mennonite faith because the general Christian service allows playing of musical instruments, clapping, and shouting, practices to which he objects.  The Supreme Court has held that various religious groups are not required to have identical treatment.  *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972).  Instead, prison officials must only ensure that each religious group has a reasonable opportunity to exercise its religious beliefs.  *Id.*  Following this Supreme Court case, the lower courts have found interfaith religious services to be sufficient, as long as there is a reasonable relationship between the service and the tenets of the subsidiary sects. *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995)(inmate practicing Pentecostal faith did not establish substantial burden on having to worship during "interfaith" Christian services); *Clifton v. Craig*, 924 F.2d 182, 184 (10th Cir. 1991)(no requirement that

12

Church of Christ services be held separately when there are services for Christians); *Weir v. Nix*, 114 F.3d 817, 820-21 (8th Cir. 1997)(fact that Protestant minister conducted inclusive Protestant services, which were against inmate's exclusive beliefs, was not enough for the inmate to get a separate service, where the minister's beliefs mirrored the inmate's beliefs in all other respects); *Crosley-El v. Berge*, 896 F.Supp. 885, 889 (E.D.Wis. 1995)(general Muslim service for all Islamic inmates, rather than providing separate Moorish services does not place substantial burden on exercise of Moorish religion). The rationale for this is that "the large number of religious groups represented in the prison population and such factors as security, staffing, and space" can make separate services for all groups logistically infeasible. *Clifton*, 924 F.2d at 185.

There is no evidence that FCI Estill's lack of a separate worship service for Mennonites faith places a substantial burden on the plaintiff's religious rights. Instead, it is clear that requiring a separate service for a single person would be a tremendous burden on FCI Estill.

The plaintiff next complains that the defendants do not permit inmates confined in the SHU to attend congregate worship services. If the administrative detention of a prisoner is proper, prison officials and employees have to establish only that the prisoner had some opportunity to exercise his right to freely exercise his religion in order to pass constitutional scrutiny. *Alston v. DeBruyn*, 13 F.3d 1036, 1039-40 (7th Cir. 1994). While the plaintiff was confined in the SHU, he was provided with the opportunities set forth in BOP policy, as well as the opportunity to maintain religious literature in his cell and speak telephonically with Mennonite clergy (Broome decl. ¶ 13). There was no burden placed upon his right to practice his religion, even though he was not able to attend general population worship services while confined in the SHU. The penological objective of protecting his personal safety, because he claimed he was the victim of an assault, outweighed his practice of attending congregate worship services. However, the plaintiff's

13

religious exercise was not totally banned as he was provided with means to satisfy his religious needs.  All inmates in the SHU need to be removed from the general population for some reason.  *See* 28 C.F.R. § 541.22 (inmate placed in Administrative Detention when "the inmates continued placement in general population poses a serious threat" to his safety or that of others).  As argued by the defendants, it is illogical then to require the plaintiff to be released to attend general worship services in the same population from which he requires protection.

The plaintiff also claims that because the Mennonite faith mandates its members work and perform all needs necessary to satisfy the Mennonite church and family support, the BOP is mandated pursuant to 18 U.S.C. §§ 3624(c) and 3621(b)(3) to place him in a halfway house so he can accomplish his religious mandates.  Specifically, the plaintiff claims the "characteristics" of his religious tenet contain a liberty interest and right to associate, which is a unique set of rights that dictates housing him in a halfway house.  Pursuant to the statutory scheme set forth by Congress, the BOP takes custody of federal offenders who have been sentenced to serve a term of incarceration.  For offenders sentenced to imprisonment, 18 U.S.C. § 3621(b) instructs the BOP to designate the place of imprisonment.  There are five factors under 18 U.S.C. § 3621(b), that the BOP must consider when designating the place of imprisonment, which are:

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence—
(A) concerning the purpose for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

14

18 U.S.C. § 3621(b).   Under 18 U.S.C. § 3624(c), the BOP is instructed to allow a sentenced offender to spend "a reasonable part, not to exceed six months, of the last [10 %] of the term" of his sentence in conditions that will allow him a reasonable opportunity to adjust and prepare for reentry into the community.   As argued by the defendants, the plaintiff does not yet meet the requirements for RRC placement (Carlson decl. ¶ 5).  Placing the plaintiff into an RRC at this time is not proper due to the length of time required to serve on his sentence, and the BOP does not ordinarily refer individuals with a Public Safety Factor of "Sex Offender" for RRC placement (Carlson decl. ¶ 7).   Furthermore, there is nothing so unique about the plaintiff's "circumstance" of being a Mennonite that would entitle him to RRC placement.  The alleged unique liberty interest and right to associate that the plaintiff claims mandates his placement in a halfway house is legitimately restrained by the government's interest in protecting society from convicted individuals.

Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it.  *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for

15

official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609.  If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights.  Therefore, the defendants are entitled to qualified immunity.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted.  All remaining pending nondispositive motions will be held in abeyance pending the district court's disposition of the motion for summary judgment.  Should the district judge adopt this court's recommendation, these motions will be rendered moot.

IT IS SO ORDERED.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

September 13, 2007

Greenville, South Carolina